UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

KEVIN THOMPSON,

                Plaintiff,

    v.

DEKALB COUNTY, GEORGIA;
NELLY WITHERS, in her official capacity
as Chief Judge of the DeKalb County
Recorders Court; JUDICIAL CORRECTION
SERVICES, INCORPORATED,

             Defendants.

Civil Action No. _____

**COMPLAINT**

**(Violation of Fourteenth Amendment Rights)**

JURY TRIAL
REQUESTED

**INTRODUCTION**

1.    Plaintiff Kevin Thompson, a teenager at the time of the events described in this Complaint, was incarcerated for five days in the DeKalb County Jail in Decatur, Georgia because of his inability to pay $838 in fines and fees related to a traffic ticket within thirty days of sentencing.

2.    Mr. Thompson's jailing was the direct result of DeKalb County's policy, practice, and custom of seeking revenue from indigent people sentenced to the payment of fines and fees for traffic offenses and County ordinance violations.

DeKalb County, through senior policymaker Chief Judge Nelly Withers of the DeKalb County Recorders Court ("Recorders Court"), enlisted Judicial Correction Services, Incorporated ("JCS"), a for-profit company, to secure payments of DeKalb County fines and fees through the practice of "pay-only probation"—probation imposed for the sole purpose of collecting fines and fees from those who cannot afford to pay in full on sentencing day.  The terms of their contractual agreement incentivized collection from people too poor to pay at sentencing, while creating disincentives for the identification of indigent probationers whose failure to pay was the result of poverty.

3.      DeKalb County, Chief Judge Withers, and JCS established policies, practices, and customs that directly led to the conditioning of indigent people's freedom on paying money they did not have.  They pursued fine and fee payments from indigent pay-only probationers, while failing to adequately train, direct, and supervise the judges and probation company employees involved in their collection scheme on probationers' constitutional rights to request court-appointed counsel and to an indigency hearing prior to being jailed for failure to pay.  DeKalb County, Chief Judge Withers, and JCS also persisted in these policies, practices, and customs despite their awareness of the widespread and pervasive deprivation of probationers' rights to request counsel and to indigency hearings in Recorders

Court probation revocation proceedings, including those heard by the judge who sentenced Mr. Thompson to jail.  As a direct result of these policies, practices, and customs, Mr. Thompson was improperly and illegally jailed for probation violation simply because he was poor.

4.     Mr. Thompson was initially sentenced to pay-only probation with JCS because he could not afford to pay $810 in fines related to a ticket for driving on a suspended license.  A Recorders Court judge ordered Mr. Thompson to pay the entire $810 and additional costs within thirty days, and placed him on probation with JCS.

5.     Mr. Thompson reported weekly to JCS and explained to his probation officer that he was unemployed.  He made painstaking efforts to pay his fines and fees by borrowing money from relatives and earning what he could by completing odd jobs.  He was able to pay a total of about $85—$30 of which was retained by JCS for its fee.  Nevertheless, a JCS probation officer charged Mr. Thompson with probation violation for failure to pay, misinformed him that he would have to pay an additional $150 for a public defender to represent him in his probation revocation proceedings, and failed to notify him that he had a right to request representation by counsel at no cost.  After providing Mr. Thompson incorrect and incomplete information, the JCS probation officer checked off a box on a form

3

signed by Mr. Thompson to indicate that he had purportedly waived his right to a public defender.

6.     Recorders Court Judge Angela Brown revoked Mr. Thompson's probation in a hearing that lasted only minutes and sentenced him to nine days in jail.  Judge Brown failed to conduct any inquiry or make any findings concerning Mr. Thompson's ability to pay or efforts to secure resources, or the adequacy of alternatives to incarceration.  Judge Brown also failed to advise Mr. Thompson of his right to request court-appointed counsel at no cost, failed to inquire into the circumstances of Mr. Thompson's purported waiver of that right, and did not afford him counsel, despite evidence of his indigency.

7.     Mr. Thompson was handcuffed in front of his mother, taken to jail, and ultimately incarcerated for five days.  He suffered humiliation, anxiety, stress, emotional distress, and other irreparable injury from being separated from his family and incarcerated in unsanitary and cold jail conditions without enough food to eat.

8.     The actions, policies, practices, and customs of DeKalb County, Chief Judge Withers, and JCS directly and proximately caused the deprivation of Mr. Thompson's liberty and violated his rights under the Due Process and Equal

4

Protection Clauses of the Fourteenth Amendment to the U.S. Constitution.  Mr.

Thompson brings this lawsuit to vindicate those rights.

## PARTIES

9.      Plaintiff Kevin Thompson is a nineteen-year-old resident of Decatur,

Georgia, where he lives with his mother, sister, and four-month-old niece.

10.     Defendant DeKalb County, Georgia ("DeKalb County") is a local

subdivision of the State of Georgia and a body corporate organized and existing

under the Constitution of the State of Georgia.  Ga. Const. Art. 9 § 1 ¶ 1 (2014);

Ga. Code Ann. § 36-1-3 (2014).  DeKalb County relies heavily on the Recorders

Court, which is a division of the County's executive branch, to generate County

revenue through the collection of fines and fees imposed in cases involving

violations of DeKalb County ordinances and regulations, State traffic offenses, and

any other offense specified by the Georgia General Assembly.  *See* DeKalb

County, Ga. Code app. B, art. XII, §§ 653, 655, 684 (2014).

11.     Defendant Chief Judge Nelly Withers is the chief judge of the

Recorders Court and the final DeKalb County policymaker concerning the

collection of County revenue through Recorders Court probation.  Her

administrative and executive responsibilities include directing Recorders Court

probation, establishing probation policies and practices, and training, directing, and supervising Recorders Court judges on, among other things, the collection of fines and fees and the protection of probationers' rights.  Chief Judge Withers is a DeKalb County employee and was appointed by the DeKalb County Board of Commissioners.  She is sued in her official capacity for actions taken in her executive and administrative role.

12.     Defendant Judicial Correction Services, Incorporated, is a Delaware corporation that is registered as a foreign corporation doing business in the State of Georgia, this District, and this Division.  JCS is a person acting under the color of state law and liable under 42 U.S.C. § 1983.

13.     Defendants undertook all of the acts set forth herein under color of state law and all acts can fairly be attributed to DeKalb County.  Each Defendant is a "policymaker" with respect to the policies, practices, and customs challenged in this lawsuit.

## JURISDICTION AND VENUE

14.     This is a complaint for damages based upon civil rights violations committed by DeKalb County, Chief Judge Withers, in her official capacity, and JCS, in violation of the Fourteenth Amendment to the U.S. Constitution.

6

15.     This Court has subject matter jurisdiction over Mr. Thompson's claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), (c) and (d) because this judicial district is where a substantial part of the events or omissions giving rise to the claim occurred and where DeKalb County, Chief Judge Withers, and JCS reside.

## FACTUAL ALLEGATIONS

### A) Mr. Thompson's Traffic Tickets

17.     Prior to July 18, 2014, Mr. Thompson had been earning about $200 per week through paid training in auto repair, mechanics, and tow truck driving.

18.     On July 18, 2014, a DeKalb County police officer stopped Mr. Thompson's car shortly after Mr. Thompson had pulled it out of the driveway of his home.

19.     The officer told Mr. Thompson that his driver's license was suspended.  Mr. Thompson was surprised and unaware that his driver's license was suspended at that time.

20.     Mr. Thompson was jailed for one night in the DeKalb County Jail and notified that he was charged with driving on a suspended license.

21.     Mr. Thompson subsequently learned that his driver's license was suspended because he forgot to submit a Notice of Withdrawal of Suspension to the Georgia Department of Driver Services ("DDS") in April 2014 following his resolution of a charge for Failure to Appear ("FTA") in the Municipal Court of Atlanta for a ticket concerning a minor traffic violation.  The Municipal Court of Atlanta had charged Mr. Thompson with FTA and suspended his driver's license because he had arrived for his hearing after the 8:00 a.m. start time.  Mr. Thompson did not receive written notice that his driver's license remained suspended between his resolution of the FTA charge and his July 18, 2014 arrest.

22.     On October 9, 2014, Mr. Thompson appeared before a Recorders Court judge and pled guilty to the charge of driving on a suspended license.  The judge sentenced Mr. Thompson to an $810 fine, and asked if he would be able to pay that day.  Mr. Thompson answered that he could not.  The judge then ordered Mr. Thompson to pay the $810 fine within thirty days, to serve twelve months of probation, and to pay court costs, probation fees, and a Georgia Crime Victim Emergency Fund fee.

23.     After his hearing, Mr. Thompson was required to sign up with JCS for pay-only probation.  He was assigned to JCS probation officer Shanekia Thomas.

24.    DDS notified Mr. Thompson that his driver's license was suspended for six months due to his October 9, 2014 conviction for driving on a suspended license.

**B) JCS Pay-Only Probation**

25.    Mr. Thompson first reported to JCS on or around October 30, 2014. He explained to Ms. Thomas that he could not afford to pay any money toward his fine and JCS fees at that time.  Ms. Thomas instructed Mr. Thompson to report weekly to the JCS office in Tucker, Georgia.

26.    Mr. Thompson reported weekly to JCS and paid what money he could during each visit.

27.    While he was on probation, however, Mr. Thompson earned only an average of $80 dollars each week from doing odd jobs for an auto shop while looking for work.  He was unable to earn enough money to pay for basic necessities, including food, public transportation, and his portion of the rent for his family's home.  The suspension of his driver's license through April 2015 made it difficult for him to look for, and secure, paid employment.

28.     Despite being unemployed and lacking any source of steady income, Mr. Thompson diligently tried to acquire money to make payments toward his fines and fees, including by borrowing money from relatives.

29.     On or around November 6, 2014, Mr. Thompson reported to JCS and paid about $5, which he had borrowed from his sister.

30.     On or around November 13, 2014, Mr. Thompson reported to JCS and paid about $60, which he had borrowed from his mother.

31.     On or around November 20, 2014, Mr. Thompson reported to JCS and paid about $20, which he had borrowed from his grandmother.

32.     At some point between October 9, 2014 and December 4, 2014, Mr. Thompson submitted to a Recorders Court clerk an application for a Limited Driving Permit, which he believed would permit him to drive for work purposes if signed by a Recorders Court judge.  The clerk made a copy and told Mr. Thompson that she would give the form to her supervisor.

33.     On December 4, 2014, Mr. Thompson reported to JCS, but did not have any money to pay.  Ms. Thomas served Mr. Thompson with a document entitled, "DeKalb County Recorder's Court, State of Georgia, Petition of Revocation of Probation."

34.     Upon information and belief, the Petition of Revocation of Probation is a standard form promulgated and approved by the chief judge of the Recorders Court.  It has been routinely and customarily used by JCS when charging indigent Recorders Court probationers with probation violation for failure to pay fines and fees.

35.     The Petition of Revocation of Probation ordered Mr. Thompson to appear in Recorders Court on December 8, 2014.  It charged him with violating the terms of his probation by failing to pay $28 in fees to JCS, $792 in fines and fees to the Recorders Court, and $18 to the Georgia Crime Victim Emergency Fund.

36.     The Petition of Revocation of Probation did not report that Mr. Thompson could not afford to pay these fines and fees, was unemployed, and was facing difficulty seeking and finding work due to the suspension of his driver's license.

37.     The Petition of Revocation of Probation includes an "Acknowledgment" section containing the following language: "I am aware that I may employ legal counsel as [sic] said hearing or be represented otherwise as the Court may direct."  The Georgia Court of Appeals held more than twenty years ago that this language fails to adequately inform an indigent person that he may request court-appointed counsel for representation in probation revocation proceedings.

11

*See Adams v. State*, 207 Ga. App. 508, 510, 428 S.E.2d 613, 615-16 (Ga. Ct. App. 1993).

38.     The Petition of Revocation of Probation did not inform Mr. Thompson of his right to request court-appointed counsel to represent him in his probation revocation proceedings.  Nor did it inform Mr. Thompson of the right of indigent probationers to court-appointed counsel at no cost in revocation proceedings concerning failure-to-pay charges.

39.     When Ms. Thomas provided Mr. Thompson the Petition of Revocation of Probation, she asked whether he wanted a public defender.  Mr. Thompson did not understand the role of a public defender, and asked Ms. Thomas to explain.  Ms. Thomas told Mr. Thompson that he could pay $150 for someone to speak for him in court, or that he could speak for himself if he waived his rights.

40.     Ms. Thomas stated an incorrect amount for the fee that may be charged to a probationer represented by a DeKalb County public defender.  The fee is $50—not $150.  She also withheld the fact that the DeKalb County Public Defender's Office may waive the $50 fee for those who cannot afford to pay it.

41.     Mr. Thompson could not afford to pay $150 for an attorney.  He also did not understand from Ms. Thomas's explanation the risks associated with appearing unrepresented in his probation revocation proceedings, including the risk

12

of jail time if found to have violated the terms of his probation, or the benefits of being represented by a public defender.  Nor did Mr. Thompson understand that he could apply for a waiver of the public defender fee if the court appointed him counsel.

42.     Mr. Thompson told Ms. Thomas that he would waive his right to a public defender because he could not afford to pay $150.  He signed the bottom of the Petition of Revocation of Probation.

43.     Ms. Thomas checked off a box at the bottom of the revocation petition next to the phrase "Right to Public Defender Waived."

### C) Probation Revocation and Imprisonment in the DeKalb County Jail

44.     On December 8, 2014, Mr. Thompson and his mother went to the Recorders Court for his probation revocation hearing.

45.     Judge Angela Brown called Mr. Thompson's case, held up a copy of the Petition of Revocation of Probation charging him with probation violation, and asked him to verify his signature underneath the "Acknowledgment" section of the form.  Mr. Thompson verified that the signature on the petition was his.

46.     Judge Brown did not inform Mr. Thompson of his right to request court-appointed counsel to represent him in his probation revocation hearing, or

ask him any questions about the circumstances in which he had signed the Petition of Revocation of Probation. Nor did she engage in any colloquy with Mr. Thompson concerning any purported waiver of his right to request court-appointed counsel.

47.    Judge Brown asked to hear from the JCS probation officer in attendance. The JCS probation officer (not Ms. Thomas) recommended that the judge order Mr. Thompson to pay the balance of his fines and fees in full that day or serve ten days in jail. The officer did not inform Judge Brown that Mr. Thompson had made several payments toward his fine.

48.    Judge Brown indicated that Mr. Thompson could speak.

49.    Mr. Thompson explained that he had told his probation officer that his driver's license was suspended and that he needed a driver's license in order to work. He also explained that he had spoken to JCS about a document that he believed would permit him to drive for work, but that JCS had instructed him to see a judge about it.

50.    Judge Brown interrupted Mr. Thompson to say that the suspension of Mr. Thompson's license and his request for a permit were DDS matters, and that she was dealing with his failure to pay $810 in fines and fees within thirty days of sentencing.

14

51.     Mr. Thompson explained that he was not able to pay the fine because he was a tow truck driver and could not get to work or drive a truck without a driver's license or a permit.  He also explained that he had paid what he could toward his fines and fees, but could not pay a lot of money because he was not working.  Mr. Thompson further explained that he had brought a permit form to the Recorders Court prior to his hearing to see if the court could grant the permit, which would enable him to work, help support his family, and pay his fines and fees.  Mr. Thompson asked the judge to understand that he was doing the best he could.

52.     Judge Brown took a short recess.  After she returned, Judge Brown asked Mr. Thompson if he had served any time in jail when he was arrested.

53.     Mr. Thompson confirmed that he had spent time in jail.

54.     Judge Brown then sentenced Mr. Thompson to nine days in jail.

55.     At no point during the hearing did Judge Brown ask Mr. Thompson questions about his ability to pay, efforts to borrow money, cash resources, assets, job prospects, or whether staying out of jail would assist Mr. Thompson in finding work and paying his fines and fees.  Nor did Judge Brown make any indigency determination on the record prior to sentencing Mr. Thompson to jail.  She did not state any finding that Mr. Thompson had willfully failed to pay or had made

15

insufficient efforts to acquire the resources to pay, or that no adequate alternatives to incarceration existed.

56.    Although Mr. Thompson asked Judge Brown for assistance in securing a driving permit that would allow him to drive for work and help him earn money, Judge Brown ordered Mr. Thompson to be jailed without pursuing this option or discussing any other alternatives to incarceration, such as a waiver or reduction of the amount Mr. Thompson had to pay, an extension of time to pay, or community service.

57.    Mr. Thompson asked Judge Brown if he could hug his mother.  The judge denied the request.

58.    Mr. Thompson felt ashamed and humiliated that he was being jailed and separated from his mother and family.  When he realized that his mother was seeing him handcuffed and taken to jail, he began to cry.

59.    Mr. Thompson was incarcerated in the DeKalb County Jail for five days.  He does not know why he was released before serving the full sentence of nine days.

60.    Mr. Thompson suffered humiliation, anxiety, stress, emotional distress, and other irreparable injury from being handcuffed and taken to jail in

front of his mother, forcibly separated from his mother and family, and detained for five days in unsanitary and cold jail conditions without enough food to eat.

61.    Because of his experience being jailed due to his inability to pay fines and fees, Mr. Thompson is now scared of the police.  For days after his release from the DeKalb County Jail, Mr. Thompson was afraid that he could be jailed again and constantly carried a document confirming his release so that he would not be improperly arrested and jailed.

### D) DeKalb County and JCS's Revenue Collection Scheme

62.    Since 2008, DeKalb County and JCS have pursued a policy, practice, and custom of seeking revenue through the use of probation to collect fines and fees imposed by the Recorders Court for traffic offenses and other misdemeanor crimes.  Those targeted include indigent people who are placed on pay-only probation solely because they cannot afford to pay their monetary sentences in full on sentencing day.

63.    The Recorders Court is located within the executive branch of DeKalb County, and was created pursuant to a local amendment to Article VI, Section I of the Constitution of Georgia 1945, ratified November 4, 1958 (Ga. L. 1958, p. 582).

The chief judge and associate judges of the Recorders Court are DeKalb County employees, and are appointed by the DeKalb County Board of Commissioners.

64.     DeKalb County relies heavily on the Recorders Court to raise money for general County expenditures.  In 2010, DeKalb County faced a $100 million revenue shortfall and relied on the Recorders Court's collection of fines and fees to help bridge the gap.  In 2014, the Recorders Court was the largest contributor of revenue to DeKalb County's total collection of fines and forfeitures.  According to the 2014 DeKalb County Budget, the Recorders Court generated over $30 million for DeKalb County in 2013 and was projected to generate an estimated $26,949,286 in revenue for the County in 2014.  These collections far exceed the projected 2014 cost of operating the Recorders Court, which amounted to only $3,704,635.

65.     In March 2008, DeKalb County issued Request for Proposals No. 08-500079 ("RFP No. 08-500079"), which solicited proposals for probation services to the Recorders Court.  RFP No. 08-500079 made clear that a central goal of these probation services was to collect fines and fees for DeKalb County.  RFP No. 08-500079 further provided that "[c]omprehensive probation service plans shall be performed . . . under the direction of the Chief Judge of the Recorder's Court or her designee."

18

66.     JCS submitted a Service Provider Response to RFP 08-500079 ("JCS Response"), which emphasized the company's focus on fine and fee collection. JCS boasted of the company's record of "high collection" rates, and asserted that "in **every** instance where JCS has transitioned a caseload from a previous private provider, *we have increased the fine collection rate for the court*!"  JCS promised that the company would "assume the responsibility of collecting all funds" on behalf of DeKalb County, including from "Fine Pay Only" probationers.  Although JCS acknowledged that "[o]ften a probationer will not be able to pay the total amount due in a given month," it failed to address how employees would handle such cases, when or how they would inquire into financial hardship or inform probationers charged with failure to pay of their right to request court-appointed counsel, or what guidelines employees would follow to help judges identify indigent probationers and guard against the improper jailing of indigent probationers who lacked the resources to pay their fines and fees.

67.     In 2008, DeKalb County awarded JCS the Recorders Court contract ("2008 DeKalb County-JCS Contract"), despite the company's demonstrated lack of attention to the need to protect the rights of indigent probationers targeted for fine collection through pay-only probation.

68.    The 2008 DeKalb County-JCS Contract authorized JCS to provide misdemeanor probation services to the Recorders Court through November 30, 2011, and specified that services would be provided in accordance with the terms of RFP No. 08-500079 and the JCS Response, which were both incorporated by reference into the contract.

69.    Upon information and belief, the DeKalb County Board of Commissioners appointed Nelly Withers to serve as chief judge of the Recorders Court in order to increase County fine and fee collection.  Her predecessor, Chief Judge R. Joy Walker, had been accused of "losing millions of dollars [of County revenue] in uncollected fines."  A 2009 press release announcing Withers' nomination explained that Chief Judge Withers would "manag[e] the adjudication of traffic cases, ordinance violations, and similar offenses against the county."

70.    Since she assumed office in 2010, Chief Judge Withers has served as the chief executive and administrator of the Recorders Court and the final DeKalb County policymaker on the collection of County revenue through the Recorders Court, including through the administration of pay-only probation.  Chief Judge Withers has carried out executive and administrative responsibility over Recorders Court probation, including by developing Requests for Proposals for probation services providers, evaluating and selecting providers, executing probation services

contracts, and directing probation services plans.  Chief Judge Withers is also the final DeKalb County policymaker responsible for promulgating and implementing training, direction, and supervision of Recorders Court judges on, among other things, fine and fee collection, procedures to be followed in probation revocation proceedings, and the protection of probationers' rights.  Chief Judge Withers' execution of these executive and administrative functions does not involve adjudicating disputes between litigants.

71.    Since her appointment, Chief Judge Withers has made concerted efforts to increase the amount of DeKalb County revenue collected by the Recorders Court.  In 2009, the Recorders Court generated approximately $21 million in County revenue.  In 2013, that figure rose to more than $30 million.

72.    With the approval of the DeKalb County Governing Authority and through her exercise of executive and administrative powers, Chief Judge Withers elected to continue JCS as the probation services provider for the Recorders Court after expiration of the 2008 DeKalb County-JCS Contract.  On December 8, 2011, she entered into a second contract with JCS ("2011 Recorders Court-JCS Contract"), which authorized the company to provide probation services to the Recorders Court through the end of 2013.

73.     By letter dated February 27, 2014, Chief Judge Withers notified JCS that the 2011 Recorders Court-JCS Contract would be extended on a month-by-month basis as she sought to "identify[] a partner for probation services as provided for by Georgia law."  Through the exercise of her executive and administrative powers, Chief Judge Withers extended the 2011 Recorders Court-JCS Contract on a month-by-month basis throughout 2014.

74.     Both the 2008 DeKalb County-JCS Contract and the 2011 Recorders Court-JCS Contract set forth DeKalb County and JCS's policy of fine collection from indigent pay-only probationers.  The contracts explicitly authorized JCS to collect a monthly fee of $30 from people sentenced by the Recorders Court to probation for "Fine Collection Only."  The 2011 Recorders Court-JCS Contract further set forth that JCS would provide services "[a]t no charge to the Court or the County," and that all costs would be borne by probationers themselves, with the exception of indigent probationers.  The 2011 Recorders Court-JCS Contract did not explain how JCS employees would identify or handle the cases of indigent probationers, but made clear that JCS could not collect fees from those "determined by the Court to be indigent."

75.     By virtue of the 2011 Recorders Court-JCS Contract, DeKalb County and JCS established a policy of simultaneously incentivizing the use of pay-only

probation to generate revenue for the County and JCS, while creating a disincentive for JCS to help the Recorders Court identify indigent probationers who could not be charged JCS "supervision" fees.

76.    Pursuant to the 2008 and 2011 contracts, JCS did, in fact, collect fines and fees for itself and DeKalb County from indigent pay-only probationers.  With DeKalb County and Chief Judge Withers' endorsement, JCS engaged in the following collection policies, practices, and customs: (1) increasing probationer reporting requirements from monthly to weekly reports when probationers could not afford to make the full amount of payments demanded by JCS; (2) accepting only cash or money order payments made in person at the JCS office in Tucker, Georgia; (3) failing to conduct financial assessments when probationers failed to pay or to make complete payments; (4) charging probationers with violation when a probationer could not make the full payment required by JCS; (5) failing to inform probationers charged with violation for failure to pay that they have a right to request court-appointed counsel to represent them in probation revocation proceedings; (6) failing to inform probationers charged with violation for failure to pay that they could seek waiver of any public defender fees charged if granted court-appointed counsel; and (7) misinforming probationers who failed to make

payments deemed satisfactory by JCS that they were only entitled to counsel at revocation hearings if they could immediately pay a fee.

77.     In carrying out these and other measures to collect fines and fees from indigent pay-only probationers, JCS acted under color of Georgia law.  JCS's provision of probation services is authorized by Georgia law, which governs the administration of misdemeanor probation and permits the chief judge of any court within a county, with the approval of the governing authority of that county, to contract with for-profit companies for misdemeanor probation services.  *See* Ga. Code Ann. § 42-8-100 (2014), *et seq.*; Ga. Code Ann. § 42-8-100(g) (2014).  The actions of JCS and its employees are also fairly attributable to DeKalb County because misdemeanor probation services in DeKalb County were performed by government employees prior to 1991.

### E) Failure to Train Recorders Court Judges and JCS Employees on Indigent Probationers' Rights

78.     DeKalb County, Chief Judge Withers, and JCS established a policy, practice, and custom of failing to train, direct, guide, and supervise Recorders Court judges and JCS employees on how to operate DeKalb County and JCS's program of seeking fines and fees from indigent pay-only probationers in a manner

24

consistent with federal and state law.  This failure exhibited deliberate indifference to indigent probationers' Fourteenth Amendment rights to court-appointed counsel in probation revocation proceedings concerning failure-to-pay charges, and to an indigency hearing that satisfies the requirements of *Bearden v. Georgia*, 461 U.S. 660 (1983), prior to jailing for failure to pay.

79.     DeKalb County, Chief Judge Withers, and JCS have failed to provide any training, direction, guidance, or supervision to probation officers on the procedures for handling indigent Recorders Court probationers, including those who cannot afford to make fine and fee payments.  Although Recorders Court probation services are performed under her direction, Chief Judge Withers has not provided any training, direction, guidance, or supervision to JCS employees on probationers' right to an indigency hearing prior to being jailed for failure to pay, probationers' right to request court-appointed counsel in revocation proceedings, indigent probationers' right to court-appointed counsel in revocation hearings concerning failure-to-pay charges, or the requirement that waiver of these rights be knowing, intelligent, and voluntary.

80.     DeKalb County, Chief Judge Withers, and JCS have failed to ensure that the contracts establishing their use of probation to collect fines and fees from indigent pay-only probationers provide, at a minimum, "[p]rocedures for handling

indigent" probationers and "[r]evocation procedures and circumstances," as required by Georgia law and regulation. *See* Ga. Code Ann. § 42-8-102(b)(8) (2014);  Ga. Comp. R. & Regs. § 503-1-.22(f) (2014).  Neither the 2008 DeKalb County-JCS Contract nor the 2011 Recorders Court-JCS Contract fulfills these basic requirements.

81.    The response by DeKalb County and the Recorders Court to a December 2, 2014 request under the Georgia Open Records Act, Ga. Code Ann. § 50-18-71(b) (2014), confirms that the County and Chief Judge Withers have not provided even the minimal direction or guidance required by the 2011 Recorders Court-JCS Contract itself.  The 2011 Recorders Court-JCS Contract requires Chief Judge Withers to "provide [JCS] with direction concerning what constitutes a substantial failure to comply with probation terms and conditions," and to "provide [JCS] direction as to what curative measures should be taken in the case of minor violations," which do not rise to the level of probation violation.  The December 2, 2014 Open Records Act Request sought these specific directives required by the 2011 Recorders Court-JCS Contract, as well as: (1) "[a]ll records setting forth directions, policies, procedures, regulations, forms, or guidelines from [the Recorders Court] and/or DeKalb County to JCS concerning the placement of individuals on misdemeanor probation and the revocation of probation"; and (2)

"[a]ll materials used to train probation officers, including any curriculum approved by the County and Municipal Probation Advisory Council, DeKalb County, and/or [the Recorders Court]." Neither DeKalb County nor the Recorders Court has produced any documents in response, although they have released records responsive to other portions of the December 2, 2014 Open Records Act Request.

82. Upon information and belief, DeKalb County and Chief Judge Withers have also failed to provide any training, direction, guidance, or supervision to Recorders Court judges on probationers' right to an indigency hearing prior to being jailed for failure to pay, probationers' right to request court-appointed counsel in revocation proceedings, indigent probationers' right to court-appointed counsel in revocation hearings concerning failure-to-pay charges, or the requirement that a judge determine whether any waiver of these rights is knowing, intelligent, and voluntary prior to finding the right waived.

83. DeKalb County responded that it had no documents responsive to a January 20, 2015 Open Records Act request that sought, among other records, "[a]ll final materials used by DeKalb County and the Recorders Court between September 9, 2008 and [January 20, 2015] to train, guide, and or/ [sic] direct Recorders Court judges on the rights of probationers, including any orders, guidance, protocols, manuals, procedures, regulations, and guidelines issued by the

Chief Judge of the Recorders Court." The Recorders Court received the January 20, 2015 Request, but has failed to produce any responsive records.

**F) Defendants' Knowledge of Widespread Due Process Violations in Probation Revocation Proceedings and Failure to Correct**

84.     At the time that Mr. Thompson was charged with probation violation, DeKalb County, Chief Judge Withers, and JCS were on notice that Recorders Court judges routinely and customarily revoked probation and jailed indigent probationers for failure to pay without conducting a pre-deprivation inquiry into their ability to pay, their efforts to secure money to pay, and the adequacy of alternative punishments to incarceration.

85.     At the time that Mr. Thompson was charged with probation violation, DeKalb County, Chief Judge Withers, and JCS were on notice that JCS employees routinely and customarily sought to obtain, and did obtain, written waivers of the right to counsel from indigent probationers charged with failure to pay without adequately informing probationers of their rights and by using a standard "DeKalb County Recorder's Court, State of Georgia, Petition of Revocation of Probation" promulgated and approved by Chief Judge Withers. DeKalb County, Chief Judge Withers, and JCS were also on notice that the Georgia Court of Appeals held in

1993 that the same language set forth in the "Acknowledgment" section of this standard Petition of Revocation of Probation failed to inform indigent probationers of their right to request court-appointed counsel to represent them in probation revocation proceedings.

86.     At the time that Mr. Thompson was charged with probation violation, DeKalb County, Chief Judge Withers, and JCS were on notice that Recorders Court judges routinely and customarily failed to engage in any colloquy with probationers charged with probation violation for failure to pay to determine whether any purported waiver of the probationer's right to counsel was knowing, intelligent, and voluntary.

87.     In February 2014, ten months before Mr. Thompson was improperly and illegally jailed for failure to pay, Human Rights Watch issued a report, *Profiting from Probation: America's "Offender-Funded" Probation Industry* ("HRW Report"), which described Judge Brown's failure to afford meaningful indigency hearings prior to revoking probation and jailing unrepresented Recorders Court probationers who could not afford to pay court-imposed fines and JCS supervision fees.

88.     The HRW Report described a series of probation revocation hearings held by Judge Brown on March 21, 2013.  According to Human Rights Watch:

"The first few cases proceeded quickly. According to lawyers and one probationer who were in the room, Judge Angela Brown called probationers forward and then turned to a JCS employee seated next to her to ask whether there was a warrant out for the person's arrest.  In each case, the JCS employee responded in the affirmative—though she did not actually produce evidence of that warrant for the court.  Judge Brown then told the probationer the total amount they allegedly owed in fines and JCS fees and asked whether they could pay that amount immediately and in full.  Whenever a probationer said that they could not, Judge Brown ordered their arrest.  The witnesses interviewed by Human Rights Watch emphasized that no offender had an opportunity to explain why they had not paid and the judge made no inquiries aimed at determining whether that failure was willful.  Most cases were disposed of in under a minute.  As the hundreds of people assembled in the courtroom realized why they were there, and that they faced jail time if they couldn't pay what the judge said they owed that very morning, many stood up and scrambled towards the exits. . . .  But Judge Brown ordered her deputies to man the doors to the courtroom and prevent anyone from leaving.  The session continued. All told, some 60 probationers on the 'Animal Control' docket reportedly went to jail that day for want of money."  Human Rights Watch's description made clear that Judge Brown revoked probation and jailed people for failure to pay fines

without assessing their ability to pay or efforts to secure resources to pay, the

willfulness of nonpayment, or the adequacy of alternatives to incarceration.

89.    Local and national media extensively reported on the HRW Report,

including the following news outlets: The Atlanta Journal-Constitution, The

Augusta Chronicle, The Atlantic, The Guardian, The Nation, National Public

Radio, NBC News, and Salon.com.

90.    On November 22, 2014, Carrie Teegardin of The Atlanta Journal-

Constitution reported on "whether Georgia is living up to requirements" of the

U.S. Supreme Court's decision in *Bearden v. Georgia*, 461 U.S. 660 (1983).

Teegardin reported that Recorders Court Judge Trichelle Simmons "made good on

her threat to send failing probationers 'across the street'"—to the DeKalb County

Jail—"when they hadn't paid their fines, had missed appointments with their

probation officer and their probation term was close to over."  Teegardin reported

that Judge Simmons ordered the jailing of "a woman whose original charge was an

improper left turn (she still owed $330), a man whose original charge was speeding

(he still owed $131), a woman with an expired tag and suspended registration (she

still owed $502), and a woman busted for no insurance and a suspended

registration (she owed $437).  Two men whose fines stemmed from public

intoxication cases were also sent to jail."  Teegardin's account of the proceedings

31

did not describe any inquiry by Judge Simmons into the jailed individuals' ability to pay or efforts to secure money, the adequacy of alternative punishments to incarceration, or whether any waiver of the right to request court-appointed counsel had been knowing, intelligent, and voluntary.

91.    In the same article, Chief Judge Withers made public statements acknowledging that DeKalb County's system of seeking revenue from pay-only probationers was deliberately indifferent to the rights of the indigent.  She admitted that 60 to 70 percent of Recorders Court probation cases are "simply payment plans" and that the County did not have, but needed, "a system that would offer a completely different approach, and that would make a concerted effort to determine whether someone is indigent."  Chief Judge Withers also admitted, "I believe the whole face of probation has to change to curb the perception of and potential for abuse."

92.    Upon information and belief, following the extensive local news coverage of the February 2014 HRW Report and the November 22, 2014 Atlanta Journal-Constitution article, and before the jailing of Mr. Thompson on December 8, 2014, Chief Judge Withers did not institute any training, directions, guidelines, supervision, policies, or procedures to guide Recorders Court judges on: (1) the requirement to conduct an indigency hearing prior to jailing a probationer for

failure to pay; (2) how to conduct an indigency hearing that properly considers a probationer's ability to pay and efforts to secure resources, as well as the adequacy of alternative punishments to incarceration; (3) the right of all probationers to request court-appointed counsel in probation revocation proceedings; (4) indigent probationers' right to counsel in probation revocation proceedings concerning failure-to-pay charges; or (5) the requirement that any waiver of the right to request counsel, or the affirmative right to court-appointed counsel, must be knowing, intelligent, and voluntary. Nor did Chief Judge Withers revise the deficient "Acknowledgment" language in the DeKalb County Recorder's Court, State of Georgia, Petition of Revocation of Probation. If Chief Judge Withers had taken any of these actions, she would have been engaging in administrative and executive functions through her role as a final DeKalb County policymaker.

## DEMAND FOR JURY TRIAL

93.        Mr. Thompson requests a trial by jury.

## FIRST CLAIM FOR RELIEF

### FAILURE TO PROVIDE
### PRE-DEPRIVATION INDIGENCY HEARING
### in violation of the Due Process and Equal Protection Clauses
### of the Fourteenth Amendment and 42 U.S.C. § 1983

### (Jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3))

94.    The Due Process and Equal Protection Clauses of the Fourteenth

Amendment to the U.S. Constitution have long prohibited the imprisonment of

people for the failure to pay court-imposed fines without a pre-deprivation inquiry

by a judge into the person's ability to pay, efforts to secure resources to pay, and, if

the person is found to lack ability to pay despite having made reasonable efforts to

acquire resources, the adequacy of alternatives to incarceration.  Courts are

prohibited from jailing people for failure to pay without conducting such an

inquiry and making at least one of the following findings: (1) the individual's

failure to pay was willful; (2) the individual failed to make sufficient efforts to

acquire the resources to pay; and/or (3) the individual was unable to pay, despite

having made sufficient efforts to acquire resources, but alternative methods of

achieving punishment or deterrence are not adequate.

95.    As described in and incorporating paragraphs 1 through 92, Mr.

Thompson suffered a violation of his clearly established right to an indigency

hearing when the Recorders Court revoked his probation and jailed him for his inability to pay court-imposed fines, State surcharges, and JCS fees.  The sentencing judge made no inquiry or findings concerning the willfulness of Mr. Thompson's failure to pay, the adequacy of his efforts to acquire the resources to pay, or the adequacy of alternatives to incarceration, such as a reduction or waiver of the amount to be paid, an extension of time to pay, or community service.  To the extent that the judge made any such findings, the record fails to support them.

96.     DeKalb County, Chief Judge Withers, and JCS directly and proximately caused the violation of Mr. Thompson's right to a pre-deprivation indigency hearing by developing and maintaining policies, practices, and customs that demonstrated deliberate indifference to this right and the liberty interests of indigent probationers.  These policies, practices, and customs include: (1) the use and endorsement of collection methods to secure payments toward Recorders Court fines and costs and JCS fees from indigent pay-only probationers; (2) the failure to train, direct, guide, and supervise Recorders Court judges and JCS employees on indigent probationers' right to an indigency hearing satisfying the requirements of *Bearden v. Georgia*, 461 U.S. 660 (1983), prior to being jailed for failure to pay; (3) the improper delegation of judicial responsibilities to JCS employees; and (4) the failure to investigate and address reports that Recorders

Court judges did not afford indigency hearings to probationers charged with probation violation for failure to pay.

97.   Through policy, practice, and custom, DeKalb County, Chief Judge Withers, and JCS persisted in seeking revenue from indigent pay-only probationers despite their awareness that the deprivation of probationers' right to an indigency hearing in Recorders Court probation revocation proceedings concerning failure-to-pay charges, including those heard by Judge Brown, had become longstanding and pervasive.

98.   Through policy, practice, and custom, DeKalb County, Chief Judge Withers, and JCS acted with actual malice and reckless indifference to Mr. Thompson's clearly established right to a meaningful indigency hearing prior to being jailed for failure to pay court-imposed fines, State surcharges, and JCS fees.

99.   Defendants' actions in violating Mr. Thompson's rights also constituted a violation of 42 U.S.C. § 1983.  Defendants were acting under color of law when their actions, policies, practices, and customs caused Mr. Thompson's incarceration, and their acts and omissions can be fairly attributed to the County.

100.   Mr. Thompson seeks damages, in an amount to be determined by the enlightened conscience of a jury, from DeKalb County, Chief Judge Withers, in her official capacity, and JCS for the humiliation, anxiety, stress, emotional

distress, and other irreparable injury he suffered as a result of being handcuffed and taken to jail in front of his mother, forcibly separated from his mother and family, and detained for five days in unsanitary and cold jail conditions without enough food to eat.

### SECOND CLAIM FOR RELIEF

**FAILURE TO AFFORD COUNSEL**
**in violation of the Due Process Clause**
**of the Fourteenth Amendment and 42 U.S.C. § 1983**

**(Jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3))**

101.   The Fourteenth Amendment to the U.S. Constitution affords all probationers a due process right to request court-appointed counsel in probation revocation proceedings, and affords indigent probationers a right to court-appointed counsel at no cost in probation revocation proceedings concerning failure-to-pay charges.

102.   As described in and incorporating paragraphs 1 through 92, Mr. Thompson suffered a violation of this right when the Recorders Court did not inform him of his right to request court-appointed counsel, did not afford him court-appointed counsel despite prima facie evidence of his indigency, and instead accepted a written waiver through Mr. Thompson's signature on a DeKalb County

Recorder's Court, State of Georgia, Petition of Revocation of Probation without

engaging in a colloquy to determine whether the waiver was knowing, intelligent,

and voluntary, and despite the inclusion of petition language that failed to inform

Mr. Thompson of his rights. The Recorders Court's failure to conduct such a

colloquy directly and proximately caused Mr. Thompson to appear before the

Recorders Court in probation revocation hearings without the benefit of counsel.

103. DeKalb County, Chief Judge Withers, and JCS directly and

proximately caused the violation of Mr. Thompson's due process right to counsel

by developing and maintaining policies, practices, and customs that demonstrated

deliberate indifference to this right. These policies, practices, and customs

include: (1) endorsement of JCS employees' routine use of a standard DeKalb

County Recorder's Court, State of Georgia, Petition of Revocation of Probation to

secure waivers of indigent probationers' right to counsel, despite clearly

established law holding that language used in the petition failed to inform indigent

probationers of even their most basic right to request the appointment of counsel in

probation revocation proceedings; (2) failure to train, direct, guide, and supervise

JCS employees and Recorders Court judges on probationers' right to request court-

appointed counsel and indigent probationers' right to court-appointed counsel in

probation revocation proceedings concerning failure-to-pay charges; (3) failure to

train, direct, and supervise Recorders Court judges on the standard for determining a knowing, intelligent, and voluntary waiver of rights concerning counsel; and (4) failure to investigate and address reports that Recorders Court judges did not afford counsel to indigent probationers charged with probation violation for failure to pay.

104.   Through policy, practice, and custom, DeKalb County, Chief Judge Withers, and JCS directly and proximately caused the violation of Mr. Thompson's right to counsel through their acquiescence to the routine and customary use of a standard Petition of Revocation of Probation containing language that failed to inform indigent probationers of their right to court-appointed counsel, and to the routine and customary failure of Recorders Court judges, including Judge Brown, to ensure that any written or oral waiver of the right to counsel was knowing, voluntary, and intelligent.  Defendants were aware that these practices, actions, customs, and failures had become so longstanding and pervasive as to constitute the standard operating procedure of the Recorders Court.

105.   Through policy, practice, and custom, DeKalb County, Chief Judge Withers, and JCS acted with actual malice and reckless indifference to Mr. Thompson's clearly established right to counsel as an indigent probationer charged with probation violation for failure to pay.

39

106.   Defendants' actions in violating Mr. Thompson's due process right to counsel also constitute a violation of 42 U.S.C. § 1983.  Defendants were acting under color of law when their policies, practices, and customs caused Mr. Thompson to unknowingly, unintelligently, and involuntarily waive his right to counsel, and their acts and omissions can fairly be attributed to the County.

107.   Mr. Thompson seeks damages, in an amount to be determined by the enlightened conscience of a jury, from DeKalb County, Chief Judge Withers, in her official capacity, and JCS for the humiliation, anxiety, stress, emotional distress, and other irreparable injury he suffered as a result of being handcuffed and taken to jail in front of his mother, forcibly separated from his mother and family, and detained for five days in unsanitary and cold jail conditions without enough food to eat following probation revocation proceedings in which he lacked representation by counsel.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter a judgment including:

1.   Compensatory damages in an amount to be determined at trial;

2.   Punitive damages in an amount to be determined at trial;

40

3. An award of attorneys' fees, costs, and expenses of all litigation,

pursuant to 42 U.S.C. § 1988; and

4. Such other and further relief as the Court may deem just and proper.

DATED this January 29, 2015


Respectfully submitted by,

NUSRAT JAHAN CHOUDHURY
DENNIS D. PARKER
LAURA HUIZAR
(subject to pro hac admission)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, New York 10004
Tel. (212) 519-7876
Fax (212) 549-2651

*/s/ Robert B. Remar*
ROBERT B. REMAR
Ga. Bar No. 600575
JENNIFER R. VIROSTKO
Ga. Bar No. 959286
Rogers & Hardin LLP
2700 International Tower
229 Peachtree Street N.E.
Atlanta, Georgia 30303
Tel. (404) 522-4700
Fax (404) 525-2224
*Cooperating Attorneys for the*
*American Civil Liberties Union Foundation of Georgia*

SARAH GERAGHTY
Southern Center for Human Rights

83 Poplar Street N.W.
Atlanta, Georgia 30303
Tel. (404) 688-1202
Fax (404) 688-9440